**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0271n.06

No. 16-2134

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 12, 2017
DEBORAH S. HUNT, Clerk

EESAM ARABBO,                                     )
                                                  )
    Plaintiff-Appellant,                          )
                                                  )
        v.                                    )        ON APPEAL FROM THE
                                                  )        UNITED STATES DISTRICT
CITY OF BURTON, et al.,                           )        COURT FOR THE EASTERN
                                                  )        DISTRICT OF MICHIGAN
    Defendants-Appellees.                         )
                                                  )

BEFORE: GUY, CLAY, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Eesam Arabbo alleges that three of the six city councilmembers in Burton, Michigan, and their outside legal counsel, rejected a proposal that the city help refinance his commercial mortgage because of their anti-Arab animus against him. Arabbo's complaint asserts (1) a 42 U.S.C. § 1983 equal-protection claim against city councilmembers Paula Zelenko, Stephen Heffner, and Thomas Martinbianco, and attorney Michael Joliat, and (2) a Michigan Elliot-Larsen Civil Rights Act claim under M.C.L.A. § 37.2301 against each of the individual defendants, as well as the City of Burton (the city). Defendants all moved for summary judgment on Arabbo's equal-protection claim, which the district court granted following a hearing on the motion. The district court declined to exercise supplemental jurisdiction over the state claim and dismissed it without prejudice. Arabbo now appeals, and we **AFFIRM**.

**I**

Arabbo is the developer of Blackberry Creek Village (Blackberry), a 228-unit apartment complex completed in 2004 and located in the city. The Federal Housing Administration insured the property's approximately $18 million non-recourse mortgage loan, and the Department of Housing and Urban Development (HUD) held the note. The city contributed to the development of Blackberry by enacting a payment-in-lieu-of-taxes special ordinance intended to reduce the project's tax burden and increase its financial flexibility.

By 2007, Arabbo struggled to meet Blackberry's financial obligations and asked HUD to modify his financing terms. HUD reviewed Arabbo's request and determined that he did not qualify for assistance. After HUD denied his refinancing request, Arabbo sought assistance from the city's then-mayor, Charles Smiley. In July 2009, Smiley proposed to HUD that the city purchase the note at a discounted $3.5 million purchase price. On November 12, 2009, HUD offered to sell the note to the city at a smaller discount, for approximately $6.3 million.

Arabbo, as borrower, could not purchase the note at a discount directly from HUD. On March 25, 2010, he proposed to the city council that the city act as an intermediary buyer on his behalf, purchase the Blackberry note at a discounted $6.3 million price, as HUD had offered, and become the noteholder. Arabbo would then buy the note from the city. The city charter required that such a transaction be approved by at least five city councilmembers. HUD's deadline for the city to purchase the note was noon the next day. Arabbo presented $126,000 in certified funds for the required two-percent down payment, and stated that he would obtain financing for the balance and use it to purchase the note from the city. He admitted, however, that he was still working to obtain financing for the balance of the purchase price.

Some councilmembers questioned whether the proposal would violate the city's investment policy, while others expressed concern about potential financial exposure should Arabbo fail to secure financing to purchase the note. Joliat, the city's attorney, explained that the draft loan-sale agreement with HUD would require the city to operate the Blackberry property and comply with HUD requirements, including making $640,000 in scheduled repairs, should Arabbo not come through with financing. Joliat also advised the council that the use of city funds to purchase the note would violate the city's investment policy because the policy did not list mortgage notes as a permissible investment. Despite these risks, Councilmember Duane Haskins suggested that if the deal fell through because Arabbo lacked financing, the city should be able to avoid any loss by selling the note to someone else. The council tabled the proposal to the next day, when it would vote before HUD's noon deadline. The next day, the council voted 4-2 against purchasing the note, with Zelenko, Heffner, Martinbianco, and another councilmember voting no.

In his amended complaint, Arabbo claimed that the city council's rejection of his proposal was the result of anti-Arab animus against him on the part of the individual defendants. The district court granted summary judgment to each individual defendant on the basis of legislative or qualified immunity.

## II

We review the grant of summary judgment de novo. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017). Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986) (quoting 10A Wright, Miller & Kane, Federal Practice and Procedure § 2727 (2d ed. 1983)).

We do not consider claims not first raised in a complaint. *See Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 429–30 (6th Cir. 2012).

Legislators, such as city councilmembers, enjoy absolute immunity from suits relating to "all actions taken in the sphere of legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (citation and quotation marks omitted). However, not all actions taken by a city councilmember entitle him or her to legislative immunity. "Instead, the scope of immunity depends on the nature of the activity involved." *Haskell v. Washington Twp.*, 864 F.2d 1266, 1278 (6th Cir. 1988). For instance, discretionary policymaking regarding a locality's budgetary priorities is an example of a quintessentially legislative activity. *See Bogan*, 523 U.S. at 55–56.

Government officials who perform "discretionary functions" enjoy qualified immunity from suits relating to their public functions, provided that their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). With respect to attorneys who advise government officials, private attorneys enjoy qualified immunity in connection with their representation of government clients. *Filarsky v. Delia*, 566 U.S. 377, 394 (2012).

### III

### A. The Defendant City of Burton

Arabbo's amended complaint asserts only a state-law claim against the city, and he did not seek leave to file a second amended complaint that would add the city as a defendant to his § 1983 claim. Because Arabbo does not challenge the dismissal of his state-law claim, we have

no claim against the city to review, and accordingly dismiss the appeal as to the city. *See*

*Guzman*, 679 F.3d at 429–30.

### B. The Defendant City Councilmembers

The decision to decline to engage in a financial transaction that could affect the city's budgetary priorities and that could expose it to financial risk is a legislative decision. *Cf. Bogan*, 523 U.S. at 55–56. Relying on *Kamplain v. Curry Cty. Bd. of Comm'rs.*, 159 F.3d 1248 (10th Cir. 1998), Arabbo asserts that when a governing body's act is directed at an individual, that act is administrative, not legislative. However, in *Kamplain*, an elected board banned a man from attending its public meetings, and subsequently permitted his attendance while prohibiting him from speaking; the Tenth Circuit distinguished this regulation of individual conduct from *legislative* activity because it did not deal with the promulgation of public policy. *Id.* at 1252. In contrast, Burton's city council considered and rejected *legislation*—a resolution to approve the Blackberry proposal—that an individual requested the council to consider.

Arabbo further cites *Cinevision v. City of Burbank*, 745 F.2d 560 (9th Cir. 1989), in which a city councilman voted to prohibit a promoter's concerts from being performed at a municipal amphitheater. This vote was an administrative, rather than a legislative, act, because it involved the councilman monitoring and administering an existing contract between the city and the promoter. *Id.* at 580. Here, Arabbo provides no evidence that the city had an existing custom or policy of assisting real-estate developers in refinancing their commercial properties. Rather, he asked the city to enact a new policy—that it purchase his note and re-sell it to him— and the council declined to do so.[1] In considering Arabbo's proposal, the councilmember

---

[1] Arabbo does assert that the city acquired financially distressed real-estate projects. Indeed, in 2012, the city acquired the projects of two non-Arab developers. However, unlike Blackberry, these developments, Mallard Pond and Pebble Creek, were in special assessment districts (SADs) that the city created to finance infrastructure in the developments. The city asserts that it took over these projects to preserve its infrastructure investments in them.

defendants acted in their legislative capacities, and are thus entitled to absolute immunity from suits arising from their rejection of it.[2]

## C. The Defendant City Attorney

Arabbo's evidence of discriminatory conduct by Joliat consists of Arabbo's handwritten notes and personal recollection of Joliat's statements. Arabbo's notes, however, contain nothing indicating that Joliat acted based on anti-Arab animus. According to the notes, Joliat remarked that "it was the happiest day of his life" when the council rejected the proposal. R. 71-6, PID 695. The notes also state that Joliat was critical of the transaction because it would result in a financial windfall for Arabbo, and that Zelenko, along with other councilmembers, would never let that happen. Arabbo testified that Joliat's tone of voice offended him and suggested he acted with discriminatory intent. He also testified to overhearing Joliat refer to him as Middle Eastern when speaking to a councilmember.

Smiley testified that he personally never heard Joliat make any disparaging comment about Arabbo's ethnicity, but that he had "heard there were some comments made" by Joliat. Smiley Dep., R. 73-5, PID 1164. Smiley could not recall who told him about these comments. No other witness testified to hearing Joliat make disparaging comments.

Taken in the light most favorable to Arabbo, this evidence does not show that Joliat intentionally discriminated against him. Joliat's primary role regarding the proposal was providing legal counsel. Arabbo did not allege facts supporting his claim that Joliat improperly

Whatever the explanation, this was a different type of transaction, and, more importantly, when an Arabbo development (Burton Estates) that was located in an SAD fell into financial distress, the city acquired the development, just as it had the two other properties.

[2] Arabbo argues that Zelenko made ethnically derogatory comments about him, that her vote against his proposal was motivated by her anti-Arab views, and that she influenced Martinbianco and Heffner to vote with her, thus tainting their votes with her discriminatory motivation. Because we dismiss these claims based on legislative immunity, we need not engage in an extended discussion of the merits of the allegations against the individual city councilmembers.

influenced the council to reject his proposal based on anti-Arab bias. Because there is no evidence that Joliat violated "clearly established statutory or constitutional rights," *Harlow*, 457 U.S. at 818, he is entitled to qualified immunity from suits arising from his representation of the city. *Filarsky*, 566 U.S. at 394.

## IV

For the foregoing reasons, we **AFFIRM** the grant of summary judgment as to each individual defendant and **DISMISS** the appeal with respect to the City of Burton.