In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 15-3897

DON MEADOWS,

*Plaintiff-Appellant,*

*v.*

ROCKFORD HOUSING AUTHORITY, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 3:12-cv-50310 — **Frederick J. Kapala**, *Judge.*

_____

ARGUED APRIL 26, 2017 — DECIDED JUNE 30, 2017

_____

Before WOOD, *Chief Judge*, and RIPPLE and SYKES, *Circuit Judges*.

PER CURIAM. Don Meadows alleges that his Fourth Amendment rights were violated when an administrator at the Rockford Housing Authority ("RHA") ordered the locks on his apartment changed. We must determine whether the employees of a private security company, who carried out

that order, are entitled to qualified immunity. The district court concluded that they are. We agree and thus affirm the district court's grant of summary judgment for the defendants.

# I

# BACKGROUND

## A.

The facts relevant to this appeal are undisputed.[1] Meadows worked as a building engineer for the RHA, a municipal corporation, and also leased an apartment from the agency at the reduced rent of $10 per month. The apartment was located in a high-rise occupied by elderly and disabled tenants.

Around August 2010, RHA tenants complained that someone whom they did not know was living in Meadows's apartment. Soon thereafter, Charles Doyle, who was RHA's Security Support Manager, saw an unidentified man, accompanied by a child, leave the apartment and lock the door with a key. Doyle reported his observations to the Executive Director of the RHA, John Cressman, who referred the matter to Metro Enforcement, a private security company under contract with the RHA to provide security services. John Novay, who was

---

[1] The facts are taken from RHA's statement of undisputed facts, *see* R.93, which were not contested and therefore accepted as true by the district court, *see* R.110 at 1 n.1 (citing N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party.")).

employed by Metro Enforcement as its deputy chief, was tasked with investigating whether Meadows had broken his lease by subleasing the apartment without permission.

A few weeks later, on September 17, 2010, Novay knocked on the apartment door and spoke with a person who identified himself as Marc Sockwell. Sockwell told Novay that he had been renting the apartment for about two months, but he refused to tell Novay how much he was paying Meadows in rent. Novay told Sockwell he was trespassing on RHA property, took Sockwell's apartment key, and escorted him from the building. Sockwell told Meadows about his encounter with Novay. Meadows returned to the apartment, where he says that he found some of his possessions out of place. Meadows, without notifying anyone at the RHA or Metro Enforcement, installed a new deadbolt on the door.

That same evening, RHA Security Support Manager Doyle told RHA Executive Director Cressman that an employee of Metro Enforcement (Novay) had discovered an unauthorized person in Meadows's apartment. Cressman suggested that "it might be a good idea" to change the locks on the apartment to protect the other tenants and their property.[2] Doyle, in turn, told Larry Hodges, Director of Metro Enforcement, that the locks "should be changed for security and safety purposes."[3]

The next morning, Meadows went to the police station to report that his apartment "had been ransacked."[4] While he

---

[2] R.93, ¶10.

[3] *Id.*

[4] *Id.*, Ex.3 at 21 (Meadows's Deposition p. 83).

was away from the apartment, Novay, acting under orders from Hodges, arrived to supervise the locksmith. Novay soon discovered, however, that the key he had received from Sockwell no longer worked. Novay then called Hodges, who instructed Novay to have the locksmith pick the lock. After the locksmith did so, he left to retrieve a replacement lock. Novay searched the apartment for occupants, but found none.

About twenty minutes after the removal of the locks, Meadows returned to the apartment. Upon seeing Novay, he became enraged, yelled at Novay to leave, and tried to physically remove him from the apartment. According to Meadows, he picked Novay up "by the seat of his pants and the back of his shirt," and carried Novay towards the door until Meadows slipped on the carpet.[5] Novay refused to leave, so Meadows called the police. When the police arrived, they admonished Novay that changing the locks on an apartment was "not the way you evict someone."[6] After the locksmith put a new lock on the door, Meadows was given a key and allowed to remain in the apartment that day.

## B.

Meadows initially brought suit under 42 U.S.C. § 1983 against the RHA, Metro Enforcement, Hodges, and Novay. Meadows subsequently abandoned any claims against Metro Enforcement, and the district court granted summary judg-

---

[5] *Id.*, Ex.3 at 27 (Meadows's Deposition p. 107).

[6] *Id.*, Ex.2 at 11 (Novay's Deposition p. 43).

ment for the RHA because Meadows did not identify any basis for holding the RHA liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).[7] The court also narrowed Meadows's claims against Novay and Hodges down to two: (1) a § 1983 claim that the entrance into Meadows's apartment violated his Fourth Amendment rights, and (2) a state-law trespass claim.

Novay alone moved for summary judgment and maintained that, in entering the apartment, he had not acted under color of state law but under the authority delegated to him by the RHA in its capacity as Meadows's landlord. Meadows responded that there remained triable issues of fact regarding whether Novay acted under color of state law and whether he had "committed the tort of trespass."[8] Hodges did not move for summary judgment. The district court denied Novay's motion for summary judgment, concluding that Novay had acted under color of state law in entering Meadows's apartment at RHA's behest and that a jury could find for Meadows on his unreasonable-search and state-law-trespass claims.

The court, acting sua sponte under Federal Rule of Civil Procedure 56(f)(2), also ordered the parties to brief several issues related to the application of qualified immunity to Novay and Meadows, and specifically "[w]hether qualified immunity applies to a private security guard functioning at the direct behest of a public agency."[9] After briefing, the court

---

[7] *See* R.110 at 3–4.

[8] R.98 at 7.

[9] R.110 at 6. The court also requested the parties to address "[w]hat effect, if any, summary judgment for Novay would have on the liability of Hodges, the remaining defendant." *Id*.

granted summary judgment to the defendants. The court determined that Novay was entitled to qualified immunity because he had acted under orders from Doyle, an RHA official, and because Meadows had not identified any cases showing that a reasonable governmental actor in Novay's position would have known his actions were unlawful. For the same reasons, the district court concluded that Hodges also was immune from liability on Meadows's Fourth Amendment claim. The district court then relinquished jurisdiction over Meadows's state-law-trespass claim and dismissed the case.

## II

## DISCUSSION

On appeal, Meadows challenges only the district court's grant of summary judgment for Novay and Hodges on the basis of qualified immunity. We review de novo the district court's grant of summary judgment, construing the facts in the light most favorable to the nonmoving party. *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017).

Qualified immunity protects state officials from liability for civil damages unless the plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A right is clearly established when existing precedent has placed the right's existence "beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).

Meadows does not argue that the district court erred in applying either prong of the traditional qualified immunity analysis. Instead, he claims that the district court did not have

a sufficient factual basis to conclude that qualified immunity is available to the defendants, who are employees of a private security firm.[10] He maintains that *Richardson v. McKnight*, 521 U.S. 399 (1997), is controlling.

In *Richardson*, the Court looked "to history and to the purposes that underlie government employee immunity" to determine whether prison guards employed by a private firm

---

[10] Before the district court, Novay and Hodges argued that they had acted as private parties and not under color of state law. However, after deciding this question against the defendants, the court exercised its discretion under Federal Rule of Civil Procedure 56(f)(2) and asked the parties to brief the issue of qualified immunity. In response to this request, Meadows argued that Novay and Hodges were not entitled to qualified immunity because they "ha[d] consistently claimed to have been acting as a private party and not acting under color of law"; the sole authority he cited in support of this argument was *Rambo v. Daley*, 68 F.3d 203 (7th Cir. 1995). *See* R.115 at 4–5. Meadows never argued to the district court that it was exceeding its authority under Federal Rule of Civil Procedure 56(f)(2) by raising the issue of qualified immunity sua sponte.

On appeal, Meadows reasserts his claim that *Rambo* precludes our consideration of qualified immunity. *See* Appellant's Br. 11–12. *Rambo*, however, has no application here. *Rambo* concerned our jurisdiction over *interlocutory appeals* from the denial of qualified immunity, not the defense*s* that a defendant may assert at summary judgment. We explained in *Rambo* that interlocutory appeals were permitted "only where the defendant is a public official asserting a defense of qualified immunity"; "[t]he defendants' contention that they acted as private citizens when they arrested Rambo," however, was "inconsistent with their qualified immunity defense." 68 F.3d at 206. We therefore could not "reach the merits of their argument." *Id*. Here, the district court determined that the defendants were acting under color of state law and granted summary judgment to the defendants on the basis of qualified immunity. Meadows's appeal is from the district court's *final* judgment, and we therefore have jurisdiction to hear his appeal under 28 U.S.C. § 1291.

could claim qualified immunity. *Id*. at 404. With respect to the purposes, the Court observed that "the most important special government immunity-producing concern" is that officials, if not protected by qualified immunity, will proceed with "unwarranted timidity" in the exercise of their government functions. *Id*. at 409. The Court further explained, however, that "competitive market pressures" alleviated this concern: "Competitive pressures mean not only that a firm whose guards are too aggressive will face damages that raise costs, thereby threatening its replacement, but also that a firm whose guards are too timid will face threats of replacement by other firms with records that demonstrate their ability to do both a safer and a more effective job." *Id*.

In concluding that these market pressures were at work in the case before it, the Court considered that the defendants worked as prison guards "for a large, multistate private prison management firm," which "[wa]s systematically organized to perform a major administrative task for profit" and to "perform[] that task independently, with relatively less ongoing direct state supervision." *Id*. The Court explicitly noted that it had resolved the qualified "immunity question narrowly, in the context in which it arose" — "one in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms." *Id*. at 413. "The case," the Court continued, "d[id] not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential government activity, *or acting under close official supervision*." *Id*. (emphasis added).

More recently, in *Filarsky v. Delia*, 566 U.S. 377 (2012), the Court reiterated that "*Richardson* was a self-consciously 'narrow[]' decision." *Id*. at 393 (quoting *Richardson*, 521 U.S. at 413). In *Filarsky*, the Court considered "whether an individual hired by the government to do its work," specifically a private attorney retained to assist a municipality with an official investigation, "[wa]s prohibited from seeking such immunity, solely because he work[ed] for the government on something other than a permanent or full-time basis." *Id*. at 380. The Court held that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." *Id*. at 389. In doing so, it further explained how the purposes of immunity for government officials, discussed in *Richardson*, can apply with equal force to individuals in the private sector who take on government functions:

> Sometimes, as in this case, private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct. Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity. Under such circumstances, any private individual with a choice might think twice before accepting a government assignment.

> The public interest in ensuring performance of government duties free from the distractions

that can accompany even routine lawsuits is also implicated when individuals other than permanent government employees discharge these duties. Not only will such individuals' performance of any ongoing government responsibilities suffer from the distraction of lawsuits, but such distractions will also often affect any public employees with whom they work by embroiling those employees in litigation. … Allowing suit under § 1983 against private individuals assisting the government will substantially undermine an important reason immunity is accorded public employees in the first place.

*Id.* at 391 (citations omitted).

Meadows argues that "*Filarsky* did not overturn *Richardson*" and that *Richardson* should control because Novay and Hodges worked for a private company, "Metro Enforcement, similarly subject to market pressures, similarly vulnerable to replacement by a competitor, and similarly lacking a need for qualified immunity."[11] We certainly agree that *Richardson* is still good law. *See Currie v. Chhabra*, 728 F.3d 626, 631–32 (7th Cir. 2013) (observing that "the *Filarsky* Court reaffirmed the holding of *Richardson*"). Meadows overstates, however, the similarities between *Richardson* and the circumstances before us.

Of particular importance to the Court in *Richardson* was that the defendants worked "independently" of "ongoing direct state supervision," 521 U.S. at 409; indeed, it repeated this

---

[11] Appellant's Br. 16–17.

requirement at several points in its opinion, *see id*. at 413 (noting that the case before it arose in the context of a private firm "with limited direct supervision by the government," and that it did not involve "a private individual … acting under close official supervision"). Moreover, in *Filarsky*, the Court explained that providing qualified immunity to defendants performing specific tasks at the instruction of government officials implicated "[t]he public interest in ensuring performance of government duties free from the distractions that can accompany even routine lawsuits." 566 U.S. at 391. Such distractions not only affected a defendant's ability to perform his or her duties, but also "affect[ed] any public employees with whom they work by embroiling those employees in litigation" as well. *Id*.

Here it is undisputed that Hodges and Novay were working under the direct supervision of RHA officials when they carried out the actions that Meadows challenges. Doyle, RHA's Security Support Manager, instructed Hodges that the locks on the door should be changed, and Novay was present in the apartment for that purpose.[12] Meadows does not dispute that qualified immunity would protect Doyle if he had

---

[12] In his brief, Meadows also argues that "the record does not support the court's conclusions that Novay and Hodges were 'ordered' by RHA to perform the particular act of which plaintiff complains, the unauthorized entry into his apartment." *Id.* at 14. However, Meadows acknowledges that "Doyle … contacted Mr. Hodges and told him that the locks on Apartment 101 should be changed for security and safety purposes, as suggested by Mr. Cressman." Appellant's Br. 14–15 (internal quotation marks omitted). Given Metro Enforcement's contract with the RHA, we do not believe that Doyle's instruction to change the locks reasonably could be interpreted as a suggestion. Moreover, the instruction to change the locks

changed the lock himself. Here, given the "purposes that underlie government employee immunity," *see Richardson*, 521 U.S. at 404, Novay and Hodges should be afforded the same protections.

As in *Richardson*, our holding is a narrow one. It should, by no means, be read to guarantee qualified immunity to all employees of private security companies that provide contractual security services to governmental entities. The circumstances presented here, however, establish that the defendants were operating at the direct instruction of a supervising government official. Under these circumstances, qualified immunity is available to the defendants.

## Conclusion

For these reasons, we affirm the district court's grant of summary judgment in favor of Novay and Hodges.

AFFIRMED

---

by necessity included the instruction to enter the premises for the purpose of accomplishing that task.