# United States Court of Appeals

### For the Eighth Circuit

_____

No. 20-1842

_____

Brenda Davis; Frederick Stufflebean

*Plaintiffs - Appellees*

v.

Buchanan County, Missouri; Harry Roberts; Dan Hausman; Ron Hook; Mike Strong; Jody Hovey; Brian Gross; Natalie A. Bransfield; Dustin Nauman; Advanced Correctional Healthcare, Inc.; Catherine Van Voorn, MD; Ann Marie Slagle, LPN; Ryan Crews, Warden; Corizon Health, Inc., Dft. terminated on 5/7/2018. Dft added back on 9/4/2018, Amended Complaint, Doc. 78.; Donna Euler, RN; April Powers, also known as April Griffin, also known as April Helsel; Amy Mowry; Alice Bergman; Fredrick Covillo

*Defendant*s

Michelle Munger

*Defendant - Appellant*

Karen S. Williams

*Defendant*

_____

No. 20-1843

_____

Brenda Davis; Frederick Stufflebean

*Plaintiffs - Appellees*

v.

Buchanan County, Missouri; Harry Roberts; Dan Hausman; Ron Hook; Mike Strong; Jody Hovey; Brian Gross; Natalie A. Bransfield; Dustin Nauman; Advanced Correctional Healthcare, Inc.; Catherine Van Voorn, MD; Ann Marie Slagle, LPN; Ryan Crews, Warden; Corizon Health, Inc., Dft. terminated on 5/7/2018. Dft added back on 9/4/2018, Amended Complaint, Doc. 78.; Donna Euler, RN; April Powers, also known as April Griffin, also known as April Helsel; Amy Mowry; Alice Bergman

*Defendant*s

Fredrick Covillo

*Defendant - Appellant*

Michelle Munger; Karen S. Williams

*Defendant*s
_____

No. 20-1845
_____

Brenda Davis; Frederick Stufflebean

*Plaintiffs - Appellees*

v.

Buchanan County, Missouri; Harry Roberts; Dan Hausman; Ron Hook; Mike Strong; Jody Hovey; Brian Gross; Natalie A. Bransfield; Dustin Nauman; Advanced Correctional Healthcare, Inc.; Catherine Van Voorn, MD; Ann Marie Slagle, LPN; Ryan Crews, Warden

*Defendant*s

Corizon Health, Inc.

*Defendant - Appellant*

-2-

Donna Euler, RN; April Powers, also known as April Griffin, also known as April Helsel; Amy Mowry; Alice Bergman; Fredrick Covillo; Michelle Munger; Karen S. Williams

*Defendant*s

_____

No. 20-1846
_____

Brenda Davis; Frederick Stufflebean

*Plaintiffs - Appellees*

v.

Buchanan County, Missouri; Harry Roberts; Dan Hausman; Ron Hook; Mike Strong; Jody Hovey; Brian Gross; Natalie A. Bransfield; Dustin Nauman

*Defendant*s

Advanced Correctional Healthcare, Inc.

*Defendant - Appellant*

Catherine Van Voorn, MD

*Defendant*

Ann Marie Slagle, LPN

*Defendant - Appellant*

Ryan Crews, Warden; Corizon Health, Inc., Dft. terminated on 5/7/2018. Dft added back on 9/4/2018, Amended Complaint, Doc. 78.; Donna Euler, RN

*Defendant*s

April Powers, also known as April Griffin, also known as April Helsel
*Defendant - Appellant*

-3-

Amy Mowry; Alice Bergman; Fredrick Covillo; Michelle Munger; Karen S. Williams

*Defendant*s

_____

No. 20-2075
_____

Brenda Davis; Frederick Stufflebean

*Plaintiffs - Appellees*

v.

Buchanan County, Missouri; Harry Roberts; Dan Hausman; Ron Hook

*Defendant*s

Mike Strong; Jody Hovey

*Defendants - Appellants*

Brian Gross; Natalie A. Bransfield; Dustin Nauman; Advanced Correctional Healthcare, Inc.; Catherine Van Voorn, MD; Ann Marie Slagle, LPN; Ryan Crews, Warden; Corizon Health, Inc., Dft. terminated on 5/7/2018. Dft added back on 9/4/2018, Amended Complaint, Doc. 78.; Donna Euler, RN; April Powers, also known as April Griffin, also known as April Helsel; Amy Mowry; Alice Bergman; Fredrick Covillo; Michelle Munger; Karen S. Williams

*Defendant*s

_____

No. 20-2076
_____

Brenda Davis; Frederick Stufflebean

*Plaintiffs - Appellees*

v.

Buchanan County, Missouri; Harry Roberts; Dan Hausman; Ron Hook; Mike Strong; Jody Hovey

*Defendant*s

Brian Gross

*Defendant - Appellant*

Natalie A. Bransfield; Dustin Nauman; Advanced Correctional Healthcare, Inc.; Catherine Van Voorn, MD; Ann Marie Slagle, LPN; Ryan Crews, Warden; Corizon Health, Inc., Dft. terminated on 5/7/2018. Dft added back on 9/4/2018, Amended Complaint, Doc. 78.; Donna Euler, RN; April Powers, also known as April Griffin, also known as April Helsel; Amy Mowry; Alice Bergman; Fredrick Covillo; Michelle Munger; Karen S. Williams

*Defendant*s

_____

No. 20-2292

_____

Brenda Davis; Frederick Stufflebean

*Plaintiffs - Appellees*

v.

Buchanan County, Missouri; Harry Roberts; Dan Hausman; Ron Hook; Mike Strong; Jody Hovey

*Defendant*s

Brian Gross

*Defendant – Appellant*

Natalie A. Bransfield

*Defendant*

Dustin Nauman

*Defendant - Appellant*

Advanced Correctional Healthcare, Inc.; Catherine Van Voorn, MD; Ann Marie Slagle, LPN; Ryan Crews, Warden; Corizon Health, Inc., Dft. terminated on 5/7/2018. Dft added back on 9/4/2018, Amended Complaint, Doc. 78.; Donna Euler, RN; April Powers, also known as April Griffin, also known as April Helsel; Amy Mowry; Alice Bergman; Fredrick Covillo; Michelle Munger; Karen S. Williams

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

_____

Submitted: June 17, 2021
Filed: August 24, 2021

_____

Before GRUENDER, BENTON, and STRAS, Circuit Judges.

_____

BENTON, Circuit Judge.

Justin A. Stufflebean died after allegedly being denied necessary medication while incarcerated at the Buchanan County Jail and the Western Reception Diagnostic and Correctional Center. His parents, Brenda Davis and Frederick Stufflebean, asserted 42 U.S.C. § 1983 and wrongful death claims against, among others: Jerry Michael Strong, Jody W. Hovey, Brian M. Gross, Dustin R. Nauman, Dr. Frederick V. Covillo, Michelle L. Munger, Ann Marie Slagle, April L. Helsel, Advanced Correctional Healthcare, Inc, and Corizon, LLC. The district court denied

the defendants' motions to dismiss and motions for summary judgment, ruling they are not entitled to qualified or official immunity.[1] They appeal. Having jurisdiction under 28 U.S.C. § 1291, this court affirms in part, reverses in part, and remands for proceedings consistent with this opinion.

I.

On October 26, 2015, Justin Stufflebean was sentenced to 15 years in prison by the Circuit Court of Buchanan County, Missouri. That day, during his sentencing hearing, Stufflebean's longtime doctor testified on the severity of his Addison's disease and hypoparathyroidism—both endocrine disorders. Addison's disease is characterized by the adrenal glands' failure to produce enough cortisol, an essential hormone that helps the body cope with stress and is critical to maintaining normal blood pressure and cardiovascular function. The disease also causes the adrenal glands to insufficiently control the body's calcium levels. Hypoparathyroidism causes decreased function of the parathyroid glands, which can lead to low levels of calcium.

Stufflebean's doctor testified he was "dependent upon the cortisol to be given to him exogenously," especially during times of stress. He testified, "Stufflebean suffers from one of the lowest calcium levels that any of us doctors have ever seen in the hospital and that can make him quite—makes him quite ill and very badly damaging to a body and can be life-threatening in and of itself also and has to be controlled." He testified that without medication, Stufflebean's Addison's disease would "flare up," resulting in "fatigue, malaise that's followed by severe nausea, vomiting, [and] dehydration." He testified that "if not intervened upon in the hospital . . . , it can be death within 24 to 48 hours." He testified that in the past calendar year, Stufflebean was hospitalized 16 times for treatment, not counting

---

[1]*See*, *e.g.*, **Davis v. Buchanan Cty., Mo.**, 2019 WL 7172200 (W.D. Mo. Dec. 23, 2019); **Davis v. Buchanan Cty., Mo.**, 2019 WL 7116360 (W.D. Mo. Dec. 23, 2019); **Davis v. Buchanan Cty., Mo.**, 2020 WL 1527164 (W.D. Mo. Mar. 30, 2020).

numerous emergency room and doctor visits. He also testified that Stufflebean was taken to the emergency room the week before his sentencing.

Sheriff's Deputy Brian Gross was assigned to the courtroom during Stufflebean's sentencing hearing, including during the doctor's medical testimony. His duties included maintaining courtroom order and transporting those sentenced from the courthouse to the Buchanan County Jail. As the transporting officer, he was expected to tell the jail booking officer if he believed a new inmate was a medical, mental health or suicide risk when brought to the jail.

After sentencing, Gross took Stufflebean into custody and walked him across the street to the jail. Per the jail's Medical Intake Screening questionnaire, the booking officer, Sheriff's Deputy Dustin Nauman, asked Gross if he "believe[s] that inmate is a medical, mental health or suicide risk now?" Gross did not report Stufflebean's medical conditions or treatments to Nauman. Nauman recorded "No" to the question on Stufflebean's intake form.

Nauman completed the remaining intake questions with Stufflebean. Stufflebean was previously booked by the jail in 2014 and was labeled on his previous intake form as having a "Special Conditions—Medical." Nauman answered "No" to the question "Was inmate a medical, mental health or suicide risk during any prior contact or confinement with department?" In response to the question "Are you currently under a physician's care? If yes, explain," Nauman answered "No." In response to the question "Are you currently taking any medications? If yes, list types, dosage, and frequency," Nauman listed Stufflebean's various medications, but not their dosages or frequencies. He recorded Stufflebean's various ailments, including abdominal pain, asthma, ulcers, runny nose, nasal congestion, unexplained weight loss, loss of appetite, night sweats, and fatigue. He answered "Yes" to the question "Did you refer the inmate to medical?" He did not classify Stufflebean as "High Risks—Medical" or "Special Conditions—Medical." He testified that the day Stufflebean was booked, he contacted a nurse to let them know he "booked in somebody that has medical issues."

-8-

Advanced Correctional Healthcare, an Illinois corporation providing healthcare at jails, provided on-site licensed practical nursing coverage to the jail. Nurse Ann Slagle, an ACH employee, was on duty when Nauman referred Stufflebean to the nurses for medical treatment. It is alleged she was the nurse contacted by Nauman. Stufflebean was not visited by a nurse during his 11 hours in the holding cell booking area immediately after intake.

The day of Stufflebean's booking, Slagle received his medications, brought to the jail by his mother, Brenda Davis—NATPARA[2], melatonin, hydrocodone, ondansetron, fludrocortisone, paroxetine, Calcitriol, prednisone, and Vitamin D. Slagle did not contact a doctor for an order to administer Stufflebean's medications that day. She also did not enter the medications into the jail's system before 7 a.m. the following day, October 27. Because medications must be entered by 7 a.m. to be administered that same day, Stufflebean received no medications on October 27. That day, Stufflebean filed a formal request for his medication, stating: "I called to have my medicine brought in. I have Addison's and hypoparathyroid disease. Medications brought to jail." Slagle entered the medications into the jail's system after 7 a.m. on October 27, but did not contact a doctor for approval to administer them that day.

Nurse April Helsel, an ACH employee, was on duty the morning of October 28. It is disputed whether Helsel administered Stufflebean's medications on October 28 after the medical director approved it. While she testified she did, she had no recollection of giving them and could not point to supporting medical records. Having not received his medication daily, Stufflebean's condition deteriorated during his three days at the jail—he was not eating, getting weaker, and vomited at least once.

---

[2]Davis brought specialized injection tips, necessary to administer Stufflebean's NATPARA, to the jail the following day, on October 27.

ACH's policies and its contract with the County established a system to oversee ACH's operations at the jail. Per the contract, Sheriff Mike Strong, the final decisionmaker for policies and procedures at the jail, was to attend Continuing Quality Improvement meetings with ACH to review its healthcare reports on the operation of its healthcare services and the general health of inmates at the jail. Strong testified, however, that he had no system in place to monitor the accuracy of ACH's healthcare reports, trusting ACH was providing proper care. He also testified he never compared prisoners' medical grievances to ACH's reports to verify the accuracy of ACH's claimed "zero medical grievances" reporting from 2014 to 2015.

Captain Jody Hovey, the Jail Administrator and Responsible Health Authority, was responsible to oversee the medical operations of the jail, including arranging and ensuring the quality and accessibility of all health services to inmates. He was also responsible for monitoring to ensure all aspects of inmate care for the treatment of illnesses classified as "serious." Although Strong expected Hovey was exercising "constant oversight" over ACH, Hovey did not implement a "formal process or analysis" to systemically monitor inmates' medical grievances.

On October 29, Stufflebean was transferred from the jail to the Western Reception Diagnostic and Correctional Center, a receiving center for the Missouri Department of Corrections. The Department contracted with Corizon, LLC to provide medical services, including nurses and doctors, at the Center.

During intake, Stufflebean told the on-duty nurse he had Addison's disease and hypoparathyroidism, had current symptoms of vomiting, weakness, and tachycardia (a heart rate over 100 beats per minute), and had been to the hospital to see a physician 16 times in the last year for complications from Addison's disease. The nurse recorded his blood pressure at 121/89. The nurse noted that Stufflebean was "carrying or taking" various medications, including fludrocortisone, NATPARA (including injection tips for administration), vitamin D, paroxetine, and prednisone. The nurse did not ask when he last took his medications. The nurse also recorded that Stufflebean was lethargic with a weak gait, but also that he did

-10-

not show signs of "obvious pain, bleeding, injuries, illness or other symptoms suggesting need for immediate referral."

On October 30, Dr. Frederick Covillo, a Corizon employee, performed a physical examination on Stufflebean. During the examination, Dr. Covillo charted Stufflebean's Addison's disease and hypoparathyroidism. Dr. Covillo testified Stufflebean "seemed very stable," not showing symptoms of the nausea, vomiting, dizziness, and tachycardia that were reported the day before. He admitted that Stufflebean's blood pressure was not taken on the day of his exam, and that he had access only to Stufflebean's blood pressure taken by the nurse the day before. It is disputed whether Dr. Covillo ordered medications to treat Stufflebean. Dr. Covillo did not attempt to determine when Stufflebean last took his medications. It is not disputed, however, that Stufflebean did not receive his medications at the Correctional Center.

Stufflebean's health significantly deteriorated while at the Center. In the early hours of October 31, two separate "Code 16" medical emergency calls were made on his behalf. The nurses on duty did not document the reason for the first call. For the second call, a nurse documented the next day that Stufflebean was found lying on his abdomen on the floor of his cell after falling due to feeling weak. A towel with greenish liquid on it was close to his bunk. A nurse reported asking Stufflebean whether he had recently eaten. He responded that he "took a few bites of corn a couple days ago, because I don't like food." He also told the nurse he was nauseated.

On the morning of October 31, shortly after the second Code 16 call, Stufflebean was brought to the Center's infirmary, delivered to the care of Nurse Michelle Munger, a Corizon employee. He told her that he had Addison's disease, had been experiencing a flare up since he was sentenced, had not eaten in three days, and that when ill like this in the past, he would go to the hospital and receive intravenous fluids. Munger gave him Promethazine (an anti-nausea medication) and milk. She told him that he needed to eat, sent a medical service request to mental health to help with his stress, and told him to make a service request to Dr. Covillo

-11-

if he needed to see him again. She did not contact a doctor or report his condition to the oncoming nurse.

Munger released Stufflebean to his cell. The officer who escorted Stufflebean back to his cell reported he was "weak and incoherent" and looked "dazed like he was sick." He also recalled that Stufflebean stumbled and fell down after ten to twenty steps, falling first down to his knees and then slowly down to his face. The officer said that Stufflebean didn't say anything and only "made grunting noises." The officer then got a wheelchair and wheeled the slumped-over Stufflebean to his cell and helped him into his bunk.

Less than three hours after returning to his cell, a third Code 16 was called on Stufflebean's behalf after he was found not moving on the floor of his cell. He was brought to the infirmary. He soon became "unresponsive." A fourth Code 16 was called. The medical staff performed CPR until an ambulance arrived. Stufflebean died in the hospital two weeks later on November 16, 2015. A Jackson County medical examiner declared his cause of death as "complications of polyglandular endocrinopathy."

Stufflebean's parents, Brenda Davis and Frederick Stufflebean, asserted 42 U.S.C. § 1983 and wrongful death claims against, among others: Strong, Hovey, Gross, Nauman, Dr. Covillo, Munger, Slagle, Helsel, ACH, and Corizon. On summary judgment, the district court ruled that Gross, Dr. Covillo, Munger, Slagle, and Helsel are not entitled to qualified immunity from the section 1983 deliberate indifference claim. The court concluded that the *Monell* claim against ACH survives, and that Corizon cannot assert qualified immunity. The court determined that Sheriff Strong and Captain Hovey are not entitled to qualified immunity from supervisor liability under section 1983. The court also ruled that Gross and Nauman are not entitled to official immunity under Missouri law for the wrongful death claim. Ten of the defendants appeal.

II.

This court reviews de novo the denial of summary judgment based on a rejection of claims of qualified immunity and official immunity. *McLean v. Gordon*, 548 F.3d 613, 616 (8th Cir. 2008). On appeal, this court considers the evidence most favorably to the nonmoving party, including all reasonable inferences. *Id.* Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **Fed. R. Civ. P. 56(a)**.

III.

According to Dr. Covillo and nurses Munger, Slagle, and Helsel, the district court erred in denying them qualified immunity from the parents' section 1983 deliberate indifference claim.

A threshold issue is whether these medical defendants, employees of private medical-services-providers, may assert the defense of qualified immunity in response to the parents' section 1983 claim. This court has not directly addressed whether employees of private medical-services-providers are entitled to assert the defense of qualified immunity. *See Langford v. Norris*, 614 F.3d 445, 457 (8th Cir. 2010) (recognizing, but not directly holding, that employees of Correctional Medical Services, Inc., a medical services provider and direct predecessor to Corizon, "cannot claim qualified immunity").

Although private employees, these medical defendants are considered state actors for purposes of the parents' section 1983 claim. *See West v. Atkins*, 487 U.S. 42, 57 (1988) (because the provision of medical services to inmates is "state action fairly attributable to the State," medical personnel acts "under color of state law for purposes of § 1983."); *Montano v. Hedgepeth*, 120 F.3d 844, 849–50 (8th Cir. 1997) ("physicians working in state prisons, who help to fulfill the state's Eighth Amendment obligation to inmates and who typically are the only health

-13-

professionals available to care for incarcerated persons, are persons who may fairly be said to be state actors."). *See also **Filarsky v. Delia***, 566 U.S. 377, 383 (2012) ("Anyone whose conduct is fairly attributable to the State can be sued as a state actor under § 1983." (internal quotations and citation omitted)).

But private individuals, as state actors, are not necessarily entitled to assert the defense of qualified immunity in defending section 1983 claims. ***Domina v. Van Pelt***, 235 F.3d 1091, 1096 (8th Cir. 2000) (private individuals acting under the color of state law "are not necessarily shielded from liability under § 1983 by the immunity afforded public officials." (citation omitted)).

To determine whether these medical defendants are entitled to assert qualified immunity, this court applies the factors outlined by the Supreme Court in *Richardson v. McKnight*, 521 U.S. 399 (1997) and *Filarsky v. Delia*, 566 U.S. 377 (2012). According to the Court, the availability of qualified immunity to state actors depends on two factors: the "general principles of tort immunities and defenses applicable at common law, and the reasons we have afforded protection from suit under § 1983." *Filarsky*, 566 U.S. at 384 (internal quotations and citation omitted), *applying the general principles of **Richardson***, 521 U.S. at 403–04. Applying these factors, this court concludes that these medical defendants are not entitled to assert the defense of qualified immunity.

A.

The first factor—the historical availability of immunity—does not support these medical defendants asserting qualified immunity.

Historical analysis does not reveal a firmly rooted tradition of qualified immunity for employees of private, systematically organized medical providers like ACH and Corizon. *See **Richardson***, 521 U.S. at 406 (finding "no evidence that the law gave purely private companies or their employees any special immunity from

-14-

such suits." (citation omitted)). These medical defendants have not identified a tradition of immunity, and this court has not independently identified one.

All other circuits have not found a firmly rooted tradition of immunity for similarly situated privately-employed medical professionals defending claims like those of the parents. *See Sanchez v. Oliver*, 995 F.3d 461, 468 (5th Cir. 2021) ("all of our sister circuits to have considered the issue have found no compelling history of immunity for private medical providers in a correctional setting." (citations omitted)); *Tanner v. McMurray*, 989 F.3d 860, 867 (10th Cir. 2021) ("No circuit that has considered this issue has uncovered a common law tradition of immunity for full-time private medical staff working under the color of state law."). *See also Est. of Clark v. Walker*, 865 F.3d 544, 550–51 (7th Cir. 2017) (agreeing with the Sixth Circuit that there "was no common-law tradition of immunity for a private doctor working for a public institution at the time that Congress passed § 1983" (citation omitted)), *cert. denied*, 138 S. Ct. 1285 (2018); *McCullum v. Tepe*, 693 F.3d 696, 703 (6th Cir. 2012) ("the precedents that do exist point in one direction: there was no special immunity for a doctor working for the state."); *Jensen v. Lane Cty.*, 222 F.3d 570, 577 (9th Cir. 2000) ("We have been unable to uncover even a suggestion that Oregon has a 'firmly rooted tradition' of immunity"); *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999) ("Under common law, no 'firmly rooted' tradition of immunity applicable to privately employed prison physicians exists under circumstances such as these.").

These medical defendants cite dicta from *Richardson*, where the Supreme Court noted, "Apparently the law *did* provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign." *Richardson*, 52 U.S. at 406 (emphasis in original), *citing Tower v. Glover*, 467 U.S. 914, 921 (1984), *and* J. Bishop, **Commentaries on Non–Contract Law** §§ 704, 710 (1889). But the "kind of immunity" for doctors at common law would not apply to the types of claims made by the parents here. The historical treatise cited by the *Richardson* Court states that publicly and privately employed physicians had some level of immunity from "simple negligence or want of skill,"

-15-

but were "indictable" when "criminally guilty of malpractice." **Commentaries on Non–Contract Law** § 708. *See Sanchez*, 995 F.3d at 468 ("both private and public physicians . . . could be sued or even criminally prosecuted for acts amounting to recklessness" (alteration added)); *McCullum*, 693 F.3d at 701. This court has likened the "level of culpability required to demonstrate deliberate indifference on the part of prison officials" to "criminal recklessness." *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019) (citation omitted); *Gregoire v. Class*, 236 F.3d 413, 418 (8th Cir. 2000) ("the official is entitled to qualified immunity if he could reasonably believe that his response to the risk was not deliberately indifferent (or reckless) to that risk." (citations omitted)); *Sanchez*, 995 F.3d at 469 (same). Even if private physicians had some immunity from tort claims under common law, the deliberate indifference claims here (akin to criminal recklessness) are outside its scope.

These medical defendants also argue that, in analyzing a history of immunity, this court's focus should be on the nature of the work itself, not the nature of employment. *Cf. Fourte v. Faulkner Cty., Ark.*, 746 F.3d 384, 390 (8th Cir. 2014) (government-employed doctor and nurse were not deliberately indifferent to an inmate's serious medical needs after unintentionally delaying the administration of medications). They point to *Filarsky*, where the Supreme Court held that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." *Filarsky*, 566 U.S. at 389. In its historical analysis, the *Filarsky* Court did say, "Private citizens were actively involved in government work, especially where the work most directly touched the lives of the people." *Id.* at 385. It came as "no surprise" to the Court that "the common law did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities." *Id.* at 387.

But *Filarsky*'s context is relevant here. The Supreme Court's historical analysis centered on whether an independent attorney retained by the government could raise the defense of qualified immunity. *See Sanchez*, 995 F.3d at 468. The

*Filarsky* Court expressly distinguished that case from *Richardson*, where the employees of a private prison—"a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertak[ing] that task for profit and potentially in competition with other firms"—could not assert qualified immunity. *Filarsky*, 566 U.S. at 393 (alteration in original), *citing Richardson*, 521 U.S. at 413. Unlike the approach of these medical defendants, the *Filarsky* Court did not abandon the need for particularized historical analysis. Rather, it held there is a deep history of immunity for "an individual" like Filarsky—an attorney not employed by a private firm, systematically organized to assume a major lengthy administrative task, like in *Richardson*. *Id.* at 389. *Filarsky*'s particular historical analysis is not applicable here, where these medical defendants are more similar to the employees in *Richardson* than the individual attorney in *Filarsky*. *See Sanchez*, 995 F.3d at 469.

In a similar vein, these medical defendants assert that this court's holding in *Lawyer* supports their position that this court's focus should be on the nature of the employee's work. *See Lawyer v. Kernodle*, 721 F.2d 632 (8th Cir. 1983). There, this court held that a private-physician who performed an autopsy for Pettis County was entitled to assert the defense of qualified immunity. *Id.* at 635. *See §§ 58.451, 70.220, RSMo 1978*. This court explicitly rejected the argument that the physician could not assert qualified immunity because he "was not a public official." *Lawyer*, 721 F.2d at 635. According to this court, "[w]hether [the physician] was a public official or not we find immaterial under § 1983." *Id.* (alterations added). Because the physician was "engaged under the statute to perform official duties, he was performing those duties under color of state law and he clearly enjoyed the same immunity privilege the coroner could assert." *Id.*

This court's holding in *Lawyer* does not control here. Like in *Filarsky*, the individual physician was tasked with performing a limited and discrete task for the state. *See Filarsky*, 566 U.S. at 381. *See also Est. of Jensen by Jensen v. Clyde*, 989 F.3d 848, 855–57 (10th Cir. 2021) (individual physician working part time with a county jail could assert qualified immunity); *Perniciaro v. Lea*, 901 F.3d 241, 254

-17-

(5th Cir. 2018) (psychiatrist-employees of Tulane University—an employer "not 'systematically organized' to perform the 'major administrative task' of providing mental-health care at state facilities"—could assert qualified immunity from claims arising from their work at a state mental health facility); *Est. of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1109 (10th Cir. 2016) (private physician engaged by a prison to administer an execution could assert qualified immunity).  These medical defendants are employees of systematically organized private firms, tasked with assuming a major lengthy administrative task.  They are factually dissimilar to the individuals entitled to assert qualified immunity in *Filarsky* and *Lawyer*, but like those not entitled to assert qualified immunity in *Richardson*.

### B.

The second factor—the weight of the policy reasons for affording protection from suit under section 1983—does not support permitting these medical defendants to assert qualified immunity.

The Supreme Court applies three policy considerations to determine whether private individuals, as state actors, may assert qualified immunity:  "avoid[ing] 'unwarranted timidity' in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits."  *Filarsky*, 566 U.S. at 389–90 (alteration added), *citing Richardson*, 521 U.S. at 409–11.  On balance, these factors weigh against affording immunity here.

### 1.

The first policy consideration—unwarranted timidity—is the "most important."  *Richardson*, 521 U.S. at 409.  "Ensuring that those who serve the government do so with the decisiveness and the judgment required by the public good, is of vital importance regardless whether the individual sued as a state actor

works full time or on some other basis." *Filarsky*, 566 U.S. at 390 (internal quotations and citation omitted).

This concern is "less likely present, or at least is not special, when a private company subject to competitive market pressures" works as a state actor. *Richardson*, 521 U.S. at 409 ("Competitive pressures mean not only that a firm whose guards are too aggressive will face damages that raise costs, thereby threatening its replacement, but also that a firm whose guards are too timid will face threats of replacement by other firms with records that demonstrate their ability to do both a safer and a more effective job."). The *Richardson* Court emphasized that various "marketplace pressures" give private firms "strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." *Id.* at 410. Those marketplace pressures include being "systematically organized to perform a major administrative task for profit," performing that task "independently, with relatively less ongoing direct state supervision," being insured to cover tort claims, and being pressured by "potentially competing firms." *Id.* at 409–10.

Like *Richardson*, various marketplace pressures are present here, sufficiently reducing the risk of unwarranted timidity. ACH and Corizon are for profit entities that contracted with the County and the Department of Corrections respectively to provide medical care for inmates. They were both insured, and there is no indication their insurance would not cover the types of claims made by the parents.

While these medical defendants, ACH, and Corizon were supervised by County and state officials, there is no indication the oversight "in any meaningful way distinguishes this case from *Richardson*." *Sanchez*, 995 F.3d at 470 (determining that contract language between the county and medical provider, stating the county "retained authority to set the 'policies and procedures related to healthcare [or] mental healthcare,' " did not support the conclusion that the provider did not perform its administrative task independently, with relatively less ongoing

-19-

direct state supervision (alteration in original)). *See **Tanner***, 989 F.3d at 873 ("The mere existence of a contract does not establish close supervision").

ACH and Corizon had their own procedures and policies for their medical personnel to follow. While ACH's contract with the County dictated its performance was reviewed by the County, in practice, Strong and Hovey's oversight was apparently negligible. Strong testified he had no system in place to monitor the accuracy of ACH's healthcare reports, simply trusting they were properly caring for prisoners. He also testified he never verified the accuracy of ACH's "zero medical grievances" reports. And while Strong testified he expected Hovey was exercising "constant oversight" of ACH, Hovey testified he had "no formal process or analysis done" to review prisoner's medical grievances. Corizon also had its own extensive internal policies for patient treatment protocol, outlining procedures for various medical situations. Like the County and ACH, there is no indication that the Department of Corrections had significant oversight over Corizon's medical operations.

Last, ACH and Corizon are presumably pressured by potential competitors that provide similar services. ACH's contract with the County covered a three-year period, allowing competition at the expiration of its contract. *See **Richardson***, 521 U.S. at 410 ("since the firm's first contract expires after three years, its performance is disciplined, not only by state review, but also by pressure from potentially competing firms who can try to take its place."). Corizon also faced competition from other firms, losing at least two state contracts in the years before Stufflebean's death.

Together, these marketplace pressures support the conclusion that unwarranted timidity is less likely present, or at least not special, here. *See **id.*** at 409.

2.

The second policy consideration—attracting talented candidates to public service—does not favor allowing these medical defendants to assert qualified immunity.

Generally, private individuals "have freedom to select other work—work that will not expose them to liability for government actions." *Filarsky*, 566 U.S. at 390. "Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Id.* at 391. These factors make it "more likely that the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts." *Id.* at 390. *See* ***Campbell-Ewald Co. v. Gomez***, 577 U.S. 153, 167 (2016) ("Qualified immunity reduces the risk that contractors will shy away from government work.").

But private firms have the ability to remedy these concerns. The *Richardson* Court recognized that " 'privatization' helps to meet the immunity-related need 'to ensure that talented candidates' are 'not deterred by the threat of damages suits from entering public service.' " ***Richardson***, 521 U.S. at 411 (citations omitted), *quoting* ***Wyatt v. Cole***, 504 U.S. 158, 167 (1992). Generally, private firms insure themselves to cover claims against themselves and their employees, are not subject to various "civil service law restraints," and, unlike the government, may "offset any increased employee liability risk with higher pay or extra benefits." *Id.*

This second policy consideration similarly does not favor allowing these medical defendants to assert qualified immunity. ACH and Corizon "can operate like other private firms; [they] need not operate like a typical government department." *Id.* (alteration added). *See* ***Tanner***, 989 F.3d at 869 ("Because CCS is a private firm, it has the capacity, unlike a government department, to offset any increased employee liability risk with higher pay or extra benefits." (internal

quotations and citation omitted)).  ACH and Corizon have various tools available to attract and retain talented employees, even if their employees can seek alternative, non-government employment.

3.

The third policy consideration—preventing harmful distractions caused by lawsuits—slightly favors allowing these medical defendants to assert qualified immunity.

Lawsuits "may well distrac[t] these employees from their . . . duties . . . ." *Richardson*, 521 U.S. at 411 (third alteration added) (internal quotations and citations omitted).  Even "routine lawsuits" can distract employees, affecting private employees' "performance of any ongoing government responsibilities" and "embroiling" public employees with whom they work in litigation.  *Filarsky*, 566 U.S. at 391.

Private medical personnel, though, may be uniquely equipped to handle these litigation distractions.  Doctors and nurses in private practice generally "face a constant threat of claims leading to litigation." *Tanner*, 989 F.3d at 870.  "Facing constitutional tort claims with a higher burden of proof is not any more daunting or distracting than dealing with the medical malpractice claims with which they are familiar." *Id.*  Additionally, ACH and Corizon's legal teams may "mitigate the impact of litigation" by bearing the brunt of legal work.  *Sanchez*, 995 F.3d at 472.

Even if these medical defendants may be distracted by litigation, the "risk of distraction alone cannot be sufficient grounds for an immunity." *Richardson*, 521 U.S. at 411 ("Our qualified immunity cases do not contemplate the complete elimination of lawsuit-based distractions.") (internal quotations and citation omitted).  Because the other policy considerations—including preventing unwarranted timidity, the most important consideration—do not favor immunity, this factor does not necessitate the conclusion that qualified immunity is favored

here. On balance, the policy considerations support the conclusion that these medical defendants are not entitled to assert the defense of qualified immunity.

C.

Because this court has found no firmly rooted history of immunity, and the purposes of qualified immunity, on balance, do not favor extending immunity, these medical defendants, as employees of large firms "systematically organized to perform a major administrative task for profit," are not entitled to assert the defense of qualified immunity. *Id.* at 409. *See Sanchez*, 995 F.3d at 472; *Tanner*, 989 F.3d at 874; *Clark*, 865 F.3d at 551; *Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 1578 (2017); *McCullum*, 693 F.3d at 704; *Harrison v. Ash*, 539 F.3d 510, 525 (6th Cir. 2008); *Jensen*, 222 F.3d at 580; *Hinson*, 192 F.3d at 1347.

Lacking the ability to assert qualified immunity, these medical defendants are unable to immediately appeal the district courts' denials of motions to dismiss and motions for summary judgment. *See Payne v. Britten*, 749 F.3d 697, 700 (8th Cir. 2014) ("Ordinarily, our court lacks jurisdiction to review denials of motions to dismiss and motions for summary judgment because neither is a final decision. When a denial turns on qualified immunity, however, our court has appellate jurisdiction to decide whether, as a purely legal matter, the denial was erroneous." (citations omitted)). This court expresses no opinion on the ultimate validity of the parents' underlying section 1983 claim against these medical defendants.

This holding similarly precludes immediate appellate review of ACH and Corizon's appeals here. Neither asserts its own right to qualified immunity. Rather, they assert they are not liable because there is no underlying constitutional violation by their employees. *See Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir.), *cert. denied*, 139 S. Ct. 389 (2018). They argue this court has pendent jurisdiction to hear their appeals because resolution of their appeal is inextricably intertwined with these medical defendants' assertion of qualified immunity. *See Muir v.*

***Decatur Cty., Iowa***, 917 F.3d 1050, 1053 (8th Cir. 2019). But because these medical defendants are not entitled to assert qualified immunity, ACH and Corizon's appeals are not inextricably intertwined to an immediately appealable assertion of qualified immunity.[3] The appeals of Dr. Covillo; nurses Munger, Slagle, and Helsel; and ACH and Corizon are dismissed for lack of jurisdiction.

IV.

According to Strong, Hovey, and Gross, the district court erred in denying them qualified immunity from the parents' section 1983 deliberate indifference claim.

A public official is entitled to qualified immunity unless: (1) their conduct violated a constitutional right, *and* (2) that right was clearly established. ***Williams v. Mannis***, 889 F.3d 926, 931 (8th Cir. 2018) (citations omitted). A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." ***Id.*** (alterations in original) (citations omitted). Qualified immunity is "appropriate where no reasonable fact finder could conclude that the facts when viewed in a light most favorable to the plaintiff show that the officers' conduct violated a clearly established constitutional right." ***Id.*** (citations omitted).

It is "well established that [d]eliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." ***Langford***, 614 F.3d at 459 (alteration in original) (internal quotations and citations omitted). To establish a constitutional violation based on deliberate indifference, the parents must show that Stufflebean "suffered from an objectively serious medical need" and that County officials had "actual knowledge of that need but deliberately disregarded it." ***Barton v. Taber***, 908 F.3d 1119, 1124 (8th Cir.

---

[3]ACH and Corizon do not claim that their appeals are closely related or inextricably intertwined with the appeals of Strong, Hovey, Gross, and Nauman. *See* ***Nebraska Beef, Ltd. v. Greening***, 398 F.3d 1080, 1083 (8th Cir. 2005).

2018) (citations omitted).  *See **Thompson v. King***, 730 F.3d 742, 746 (8th Cir. 2013) ("A plaintiff claiming deliberate indifference must establish objective and subjective components." (citation omitted)).

This court has defined a "serious medical need" as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." ***Camberos v. Branstad***, 73 F.3d 174, 176 (8th Cir. 1995).  On appeal, Strong, Hovey, and Gross do not dispute that Stufflebean suffered from a serious medical need.

Under the subjective prong, to show deliberate indifference, the official "must know[] of and disregard[]" the inmate's serious medical need.  ***Letterman v. Does***, 789 F.3d 856, 862 (8th Cir. 2015) (alterations in original) (internal quotations omitted), *quoting **Farmer v. Brennan***, 511 U.S. 825, 837 (1994).  *See **Barton***, 908 F.3d at 1124 ("the plaintiff must establish a mental state akin to criminal recklessness:  disregarding a known risk to the [arrestee's] health." (alteration in original) (citations omitted)).  In other words, the "evidence must show that the [official] recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." ***Letterman***, 789 F.3d at 862 (alteration added) (emphasis in original), *quoting **Krout v. Goemmer***, 583 F.3d 557, 567 (8th Cir. 2009).  "Generally, the actor manifests deliberate indifference by intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." ***Id.*** (internal quotations and citations omitted).  When considering whether an official deliberately disregarded a risk, this court "must avoid determining the question with hindsight's perfect vision." ***Id.*** (internal quotations and citation omitted).

## A.

Strong and Hovey seek qualified immunity from the parents' section 1983 deliberate indifference claim.  They assert the supervisor liability allegation fails

because they did not directly participate in Stufflebean's treatment and were not put on notice of a pattern of constitutional violations.

A supervisor may be liable under section 1983 if their "failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (citation omitted). When a "supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015), *citing Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012); *Andrews*, 98 F.3d at 1078 (same).

This "rigorous standard" requires proof that the "supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right." *Krigbaum*, 808 F.3d at 340. "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Atkinson v. City of Mtn. View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013). "Allegations of generalized notice are insufficient." *Krigbaum*, 808 F.3d at 340. "To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." *Id.* (citation omitted). In other words, the supervisor must have "notice of a pattern of conduct that was sufficiently egregious in nature." *Id.* A "single incident, or a series of isolated incidents, is usually insufficient to infer a pattern." *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018), *citing Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989). *See Mick v. Raines*, 883 F.3d 1075, 1080 (8th Cir. 2018) ("affidavits of three detainees describing alleged constitutional violations are not sufficient to establish a genuine issue of material fact regarding whether there was a widespread custom or practice of unconstitutional misconduct, known to and unaddressed by policymaking officials."). Similarly, a "number of individual and isolated incidences of medical malpractice or negligence do not amount to deliberate indifference without some specific threat of harm from a related

system wide deficiency . . . ." ***Dulany v. Carnahan***, 132 F.3d 1234, 1245 (8th Cir. 1997) (alteration added). A supervisor's "mere negligence in failing to detect and prevent a subordinate's conduct is not enough for liability under Section 1983." ***Ripson v. Alles***, 21 F.3d 805, 809 (8th Cir. 1994) (citation omitted).

In denying qualified immunity to Strong and Hovey, the district court ruled they received notice of a pattern of constitutional violations and were deliberately indifferent to them. The district court emphasized that Strong and Hovey were named as defendants in two lawsuits—*Wilkerson v. Turner*, *et al*., No. 5:12-cv-00618 (W.D. Mo. 2015) and *Fee v. Buchanan Cty., et al.*, No. 5:15-cv-06130 (W.D. Mo. 2016). In each, former inmates alleged ACH's medical personnel failed to provide medications, and that Strong and Hovey were deliberately indifferent as supervisors for failing to supervise and train.

According to the district court, these cases put Strong and Hovey on notice of constitutional violations like the one alleged by the parents. The court determined that, despite the allegations in the lawsuits, neither Strong nor Hovey took any effort to oversee ACH's medical personnel to ensure adequate treatment. The district court concluded that, having notice, their inaction could be construed as deliberate indifference. *See generally* ***Ripson***, 21 F.3d at 809 ("The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." (alteration in original) (citation omitted)).

This court has not held that two separate lawsuits, like those here, meet the rigorous standard for putting supervisors on notice of a pattern of constitutional violations. It is unlikely that two allegations of inadequate care by two inmates can put a supervisor on notice of systematic failures. *See* ***Brewington***, 902 F.3d at 803 (a single incident or series of isolated incidents is usually insufficient to infer systematic failures); ***Dulany***, 132 F.3d at 1245 (there must be notice of "system wide deficiency," not just a number of individual and isolated incidents of malpractice or negligence).

-27-

The *Wilkerson* and *Fee* lawsuits are insufficient to put Strong and Hovey on notice of a pattern of constitutional violations in the jail. While each plaintiff claimed deliberate indifference by failing to provide medications, their allegations alone do not give notice. Strong and Hovey denied the allegations, one case was dismissed by the district court, and the other was settled by the parties. They do not meet the rigorous standard to give notice.

In *Wilkerson*, plaintiff filed a federal complaint, claiming an ACH employed physician and County officials were deliberately indifferent to his serious medical needs while incarcerated at the jail. Second Amended Complaint at ¶ 44, *Wilkerson*, No. 5:12-cv-00618 (Doc. No. 41). He alleged he was denied his medications for schizophrenia, causing him to fall from his bed. *Id.* at ¶ 29. He alleged he broke his back from the fall, but was not treated for his injury. *Id.* The plaintiff named Strong and Hovey as defendants, claiming they were liable under section 1983 for failure to supervise and train. *Id.* at ¶¶ 5, 7.

This lawsuit is insufficient to put Strong and Hovey on notice of a pattern of constitutional violations. Strong and Hovey, as well as the other state and medical defendants, denied the allegations. *See* Answer to Amended Complaint, *Wilkerson*, No. 5:12-cv-00618 (Doc. No. 46, 66). The district court dismissed the suit on summary judgment, ruling that Strong was not liable as a supervisor because he did not have notice of improper training and there was no underlying violation of plaintiff's constitutional rights. Order Granting Summary Judgment at 17, *Wilkerson*, No. 5:12-cv-00618 (Doc. No. 192). The court also ruled that Hovey was incorrectly named as a defendant in the case, because at the time of the suit, he was not a captain or Jail Administrator, and was not involved in supervising the medical professionals at the jail or contracting with ACH. *Id.* at 18.

After the district court dismissed the federal lawsuit, Wilkerson sued in Missouri state court, alleging medical malpractice, medical negligence, and negligent supervision against an ACH employed doctor and ACH itself. *See* *Wilkerson v. Van Voorn*, No. 14BU-CV2595 (Mo. Cir. Ct. Buchanan Cty. 2016).

-28-

The state complaint did not name Strong, Hovey, or any other County official as defendants, and did not allege constitutional violations. *See* *Dulany*, 132 F.3d at 1245. The lawsuit was settled by the plaintiff and ACH in 2016, after Stufflebean's death.

In *Fee*, the plaintiff sued in Missouri state court, claiming Strong and Hovey were deliberately indifferent as supervisors to their serious medical needs under section 1983. Petition at ¶ 8–9, *Fee v. Buchanan Cty., et al.*, No. 15BU-CV02918 (Mo. Cir. Ct. Buchanan Cty. 2015). The plaintiff alleged that jail officials and ACH medical personnel failed to administer their medications for their seizure disorder, depression, muscle spasms, and severe anxiety attacks, causing him to suffer a seizure and strike his head. *Id.* at ¶¶ 32, 45. The plaintiff alleged that Strong and Hovey failed to supervise and train the medical personnel, resulting in the inadequate treatment. *Id.* at ¶ 8–9.

The *Fee* lawsuit is similarly insufficient to put Strong and Hovey on notice of a pattern of constitutional violations. After removal to federal district court, Strong, Hovey, and the other defendants denied the allegations of constitutional violations. Answer to Amended Complaint, *Fee*, No. 5:15-cv-06130 (Doc. No. 5, 6). After Stufflebean's death, the plaintiff settled the lawsuit with Strong, Hovey, and the other state defendants, leaving only the ACH defendants. Order Dismissing County Defendants, *Fee*, No. 5:15-cv-06130 (Doc. No. 36). With no federal questions remaining, the district court remanded the case to Missouri state court. *See* Order Granting Remand, *Fee*, No. 5:15-cv-06130 (Doc. No. 43). The state lawsuit was settled by the plaintiff and the ACH defendants in 2017. Even if Strong and Hovey accepted responsibility in their settlement, this individual complaint is insufficient to establish a "pattern" of constitutional violations. *See* *Krigbaum*, 808 F.3d at 340.

The parents counter that Strong and Hovey had the duty to investigate complaints, and their failure to do so shows deliberate indifference. *See* *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) ("Evidence that a police department has failed to investigate previous incidents similar to the incident in question may

-29-

support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment." (citations omitted)). *See also* **Mick**, 883 F.3d at 1080 (supervisors may be liable where plaintiffs have "produced evidence of prior complaints sufficient to demonstrate that the municipalities and their officials ignored" misconduct (citations omitted)). But answering the *Wilkerson* and *Fee* complaints and denying the allegations necessarily required an investigation into the claims and the determination that they were false. The investigation in *Wilkerson* went even further, completing discovery for the unsuccessful lawsuit. Strong and Hovey did not fail to investigate the claims. *Cf.* **Mettler**, 165 F.3d at 1205 (an investigation into complaints, even if "flawed," does not amount to a failure to investigate that supports a finding of ignoring misconduct).

The parents also argue that Strong and Hovey's failure to review the accuracy of ACH's "zero medical grievances" reports makes them liable as supervisors under section 1983. *See* **Farmer**, 511 U.S. at 843 n.8 (a supervisor "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist"); **Walton v. Dawson**, 752 F.3d 1109, 1119 (8th Cir. 2014) ("*Farmer*'s subjective standard does not invite prison supervisors to bury their heads in the sand." (citation omitted)). The parents' expert identified about 250 medication errors and 26 medical grievances that were not included in ACH's reports. The expert concluded that Strong and Hovey's lack of oversight "breaches the administrative standard of care." But this lack of oversight and breach of the standard of care, while arguably negligent, does not meet the rigorous standard to show deliberate indifference. Strong and Hovey did not know about ACH's systematic failures because ACH presented inaccurate reporting. This is not an instance of supervisors ignoring obvious signs of constitutionally inadequate medical care.

Like the *Wilkerson* and *Fee* lawsuits, Strong and Hovey's failure to verify the accuracy of ACH's reporting is insufficient to create liability under section 1983.

B.

Gross seeks qualified immunity from the parents' section 1983 deliberate indifference claim.

The district court ruled that a reasonable juror could find that Gross was deliberately indifferent to Stufflebean's serious medical needs because he knew that Stufflebean was in need of special medical attention when he took him to the jail, yet consciously chose not to report that information to the jail booking officer.

In determining that a reasonable juror could find that Gross actually heard the doctor's medical testimony, the district court relied on the dramatic nature of the testimony about Stufflebean's dire, life-threatening condition. Gross admitted it was "rare" for doctors to testify at sentencing hearings, that he could typically hear witnesses when they testified, and that he had a duty to report known medical conditions to the jail booking officer when answering the medical intake. The district court also relied on a photo and measurements of the empty courtroom, showing Gross's usual seat about 30 feet from the witness chair.[4]

It is disputed whether Gross paid attention to the testimony or even the nature of the offense. Viewing the evidence most favorably to the parents, Gross had the potential to hear the doctor's testimony. It is undisputed that Gross had several duties in the courtroom and that his primary job was the security of the courtroom and supervising inmates. For any given hearing, in Gross's uncontradicted words:

---

[4]The district court footnoted that a reasonable juror could draw the inference that, after hearing the medical testimony, Gross deliberately chose not to report Stufflebean's medical conditions because Stufflebean had been found guilty of a sex offense. Because there is no evidentiary support for this footnote, this court on de novo review will disregard this speculation. *See* ***Reed v. City of St. Charles, Mo.***, 561 F.3d 788, 790–91 (8th Cir. 2009) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor, without resort to speculation, conjecture, or fantasy." (internal quotations and citations omitted)).

"There could be tons of things going on to where I will not listen to testimony because, quite frankly, my job is security, not to listen to testimony."

Regardless, Gross did not violate Stufflebean's constitutional right to receive medical care for his serious medical needs. Officials are entitled to qualified immunity if they act without the "subjective intent to cause harm." *Newman v. Holmes*, 122 F.3d 650, 653 (8th Cir. 1997) ("[d]eliberate indifference, *i.e.*, the subjective intent to cause harm, cannot be inferred from a prison guard's failure to act reasonably" (alteration in original) (citation omitted)). *See Wilson v. Seiter*, 501 U.S. 294, 300 (1991) (characterizing Eighth Amendment violations as a "deliberate act intended to chastise or deter" or "punishment [that] has been deliberately administered for a penal or disciplinary purpose" (alteration added) (internal quotations and citations omitted)). Officials are also entitled to qualified immunity if they "could reasonably believe" that their "response to the risk was not deliberately indifferent (or reckless) to that risk." *Gregoire*, 236 F.3d at 418 (citations omitted).

Here, the parents have not shown that Gross had the subjective intent to cause harm, or that he could not reasonably believe that his response was not deliberately indifferent or reckless. Before Stufflebean's death, Gross had been a transporting officer for about one to two years, and previously was a booking officer for about ten years (which included medical intake screening for the jail). Due to this work experience, Gross knew that Stufflebean would complete the medical intake form during booking. Per the form, Gross knew that Stufflebean would be asked whether he was under a physician's care, if he was currently taking any medications, if he currently needed medical attention, and if he had any physical ailments, among other questions. Gross testified he had no training on spotting or reporting medical issues when bringing an inmate to booking. The parents did not contradict Gross's testimony that the inmates are "best at explaining their medical [problems] than a transporting officer" because inmates "know all their medical than we do." Gross also knew that if Stufflebean reported certain conditions (as he did here), the booking officer was required to report him to medical, where he would meet with ACH medical staff who specialized in treating inmates. In contrast, even if the

-32-

transporting officer reported they believed an inmate was a medical risk, the intake form had no express requirement for the booking officer to refer that inmate to medical. From Gross's knowledge, there was ample opportunity for Stufflebean to be referred to medical and meet with medical professionals to address his health issues. *Cf. id.* at 419 ("The question is not whether the jailers did all they could have, but whether they did all the Constitution requires." (citation omitted)).

The parents counter that, under the jail's policies, Gross was supposed to listen to courtroom testimony and report known medical conditions. But, Gross's "[f]ailure to follow written procedures does not constitute *per se* deliberate indifference." **Luckert v. Dodge Cty.**, 684 F.3d 808, 819 (8th Cir. 2012) (alteration added). This court's focus is instead on whether his acts violated Stufflebean's constitutional rights. **Perry v. Adams**, 993 F.3d 584, 587 (8th Cir. 2021) ("the issue is whether the government official violated the Constitution or federal law, not whether he violated the policies of a state agency"), *quoting* **Cole v. Bone**, 993 F.2d 1328, 1334 (8th Cir. 1993). Because there is no constitutional violation, Gross is entitled to qualified immunity.

V.

According to Gross and Nauman, the district court erroneously denied them official immunity from the parents' state-law wrongful death claim. *See* **N.S. v. Kansas City Bd. of Police Comm'rs**, 933 F.3d 967, 970 (8th Cir. 2019) ("Official immunity, like qualified immunity, is a threshold issue and subject to interlocutory appellate review."), *citing* **Div. of Emp't Sec. v. Bd. of Police Comm'rs**, 864 F.3d 974, 978 (8th Cir. 2017), **State ex rel. Barthelette v. Sanders**, 756 S.W.2d 536, 539 (Mo. banc 1988), and **State ex rel. Mo. Dep't of Agric. v. McHenry**, 687 S.W.2d 178, 181 (Mo. banc 1985).

Under Missouri law, official immunity "protects public officials sued in their individual capacities from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." **State**

***ex rel. Helms v. Rathert***, 624 S.W.3d 159, 163 (Mo. banc 2021), *quoting **State ex rel. Alsup v. Kanatzar***, 588 S.W.3d 187, 190 (Mo. banc 2019).

The purpose of official immunity is "to allow public officials to make judgments affecting the public safety and welfare without [t]he fear of personal liability." ***Alsup***, 588 S.W.3d at 190 (alteration in original) (internal quotations and citations omitted). In line with that purpose, official immunity is broadly applied. *See **id.*** at 191. "Courts applying the doctrine of official immunity must be cautious not to construe it too narrowly lest they frustrate the need for relieving public servants of the threat of burdensome litigation." ***Id.*** (internal quotations and citation omitted).

There is a "narrow exception to the application of the official immunity doctrine—i.e., when a public officer fails to perform a *ministerial* duty required of him by law, he may be personally liable for the damages caused." ***Helms***, 624 S.W.3d at 163 (emphasis in original), *quoting **Alsup***, 588 S.W.3d at 191. This exception "focuses on the nature of a ministerial act." ***Alsup***, 588 S.W.3d at 191. A ministerial act is an act that is "merely clerical." ***Id.*** (internal quotations and citation omitted). It "compels a task of such a routine and mundane nature that it is likely to be delegated to subordinate officials." ***Id.*** (citations omitted). It is "to be performed upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority, and without regard to [the public official's] judgment or opinion concerning the propriety or impropriety of the act to be performed." ***Helms***, 624 S.W.3d at 163 (alteration in original), *quoting **Alsup***, 588 S.W.3d at 191.

An act is discretionary, conversely, where "there is any room whatsoever for variation in when and how a particular task can be done." ***Id.*** (internal quotations and citation omitted). *See **Davis v. Lambert-St. Louis Int'l Airport***, 193 S.W.3d 760, 763 (Mo. banc 2006) ("Whether an act is discretionary or ministerial depends on the degree of reason and judgment required to perform the act." (internal quotations and citation omitted)). "That an official might exercise poor judgment in

a given case does not remove the conduct from the category of discretionary acts." ***K.B. v. Waddle***, 764 F.3d 821, 825 (8th Cir. 2014).

An act is not ministerial simply because the official was commanded to perform the act. That a policy or supervisor conveys authority or a duty to "act in a given situation says nothing about whether the act authorized or compelled is the sort of ministerial or clerical act to which official immunity does not extend." ***Helms***, 624 S.W.3d at 163 (citation omitted). Official immunity still applies if "the official retains authority to decide when and how that act is to be done." ***Id.*** (citation omitted).

The determination of whether an act is discretionary or ministerial is made on a "case-by-case basis," considering: "(1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity." ***Waddle***, 764 F.3d at 825, *quoting* ***Southers v. City of Farmington***, 263 S.W.3d 603, 610 (Mo. banc 2008).

A.

Gross seeks official immunity from the parents' wrongful death claim, asserting that his duty to report Stufflebean's medical conditions to the booking officer was discretionary.

After walking Stufflebean to the jail, Gross discussed with Nauman whether he, as the transporting officer, "believe[s] that inmate is a medical, mental health or suicide risk now." Gross reported that he did not believe Stufflebean was a risk now.

The district court determined that Gross was not entitled to official immunity because he failed to perform his ministerial duty to report known special medical conditions to the booking officer. The court concluded that a reasonable factfinder could find that Gross heard Stufflebean's doctor testify on his dire medical

conditions and need for medication. According to the court, although Gross understood that Stufflebean could die without his medication, he did not report the information to jail officials.

The parents point to County policies and deposition testimony to assert that Gross had the clear and unequivocal duty to report medical needs. They assert this duty was ministerial, with no room for Gross's judgment. The County Sheriff's Department policies state: "When a detainee requiring special needs care is identified, the facts surrounding the case shall be relayed to the jail commander (or designee) and the medical staff." Additionally, Sheriff Strong testified:

> Q.     Yeah, you're saying that if the deputies at the sentencing hearing have information of a special medical condition, they are supposed to report it when they bring the prisoner over to the jail for booking, correct?
>
> **A.     Correct.**
>
> Q.     Okay. And so they're supposed to be watching out for that information during the sentencing hearings, correct?
>
> **A.     I can't answer yes to that. They have several duties . . . to do right then.**
>
> . . . .
>
> Q.     Okay. So it's the transporting deputy's responsibility to report a special medical condition upon transporting the prisoner over to booking, correct?
>
> **A.     If they are aware of it, yes.**
>
> Q.     And -- and the question for you is this, because the booking officer asks that question of the transporting officer, did you expect your transporting officer to be aware of and paying attention for any special medical conditions or other medical risks to be able to answer the question in the medical intake screening questionnaire?
>
> **A.     If he is aware of that information, yes.**

Q.    Right.  And I understood that, but was -- because the question is here, there was an expectation that the transporting officer would be paying attention, fair?

**A.    Correct.**

The jail's policy that officers must report if they believe an inmate is a medical risk does not speak to the nature of the duty for official immunity purposes.  *See Helms*, 624 S.W.3d at 163; *Alsup*, 588 S.W.3d at 191.  Rather, this court must look to the nature of the duty itself, and whether Gross needed a sufficient degree of reason and judgment to perform the act, to determine whether it is ministerial or discretionary.  *See Waddle*, 764 F.3d at 825.

The *Waddle* case is instructive about whether an official's duty to report in this context is ministerial or discretionary.  There, plaintiff, a minor, argued that officials had knowledge that another individual would sexually assault her, but failed to report that information to her parents before she was assaulted.  *Id.* at 822–23.  This court held that Missouri's child-abuse reporting statute—"any . . . person with responsibility for the care of children has reasonable cause to suspect that a child has been or may be subjected to abuse . . . , that person shall immediately report to the division"—creates a discretionary duty because it "requires an exercise of discretion and personal judgment."  *Id.* at 825 (alterations in original), *citing* **§ 210.115.1, RSMo Supp. 2002**.  A "reasonable cause determination," according to this court, "requires an exercise of discretion and personal judgment, which takes the matter out of the realm of a ministerial act."  *Id.* (internal quotations omitted), *quoting Larson v. Miller*, 76 F.3d 1446, 1457 (8th Cir. 1996) (en banc).

Notably, the *Waddle* court also rejected the argument that Missouri's common law creates the ministerial duty for a health care professional to warn an intended victim when they "know[]" or "should have known" that a patient presents a "serious danger of future violence to a readily identifiable victim."  *Id.* (alteration added), *quoting Bradley v. Ray*, 904 S.W.2d 302, 312 (Mo. Ct. App. 1995).  Even with this duty and knowledge requirement—the professional must know or should have

-37-

known—the officials' duty was "discretionary under Missouri law, because it required an exercise of discretion and personal judgment." *Id.* at 826.

Like the duty to report a danger of future violence to a readily identifiable victim, Gross's response to whether he "*believe[s]*" Stufflebean was a "medical risk" "*now*" required an exercise of discretion and personal judgment. Even if Gross heard the testimony, he was still required to use his judgment to determine whether he *believed* Stufflebean was a "medical risk," per the jail's standards, *now*, that is, at the time of booking. *See* **Helms**, 624 S.W.3d at 163; **Davis**, 193 S.W.3d at 763. That his determination was incorrect or poor judgment does not bring the duty into the realm of being ministerial. *See* **Waddle**, 764 F.3d at 825. He is thus entitled to official immunity.

The parents argue that this court's holding in *Letterman* directs a different result. *See* **Letterman v. Does**, 859 F.3d 1120, 1126 (8th Cir. 2017). There, this court held that a prison's "close observation policy" created a ministerial duty to report a medical emergency when one of the policy's "criteria is met." *Id.* at 1123, 1126. The policy required an officer to "check on the inmate every fifteen minutes and report as a medical emergency any instance when they cannot observe movement or obtain a verbal response or when it appears that the inmate is not breathing." *Id.* at 1126. The officer's duty to report a medical emergency was "mandatory" and did "not depend on the officer's assessment of whether a medical emergency actually exists." *Id.* Here, unlike *Letterman*, there are not specific circumstances that a transporting officer must report to the booking officer. Per the medical intake, Gross was asked whether he believed Stufflebean was a medical risk now. Because Gross's duty was discretionary, he is entitled to official immunity.

B.

Nauman seeks official immunity from the parents' wrongful death claim, asserting that his responses to the questions on Stufflebean's intake form were discretionary.

The district court denied Nauman official immunity, determining he did not accurately complete the intake form, a ministerial duty.

Nauman's duty, per the County's medical policies and procedures, was to "review and be familiar with those policies and procedures." This required him to "conduct the Medical Intake Screening carefully and with an eye towards identifying prisoners with chronic conditions or special needs so they would be addressed properly throughout their incarceration and not fall through the cracks." This duty "inherently required him to be attentive to the questioning and the answers."

The first question on the intake form asked if the inmate was a "medical, mental health or suicide risk during any prior contact or confinement with the department." Stufflebean was previously booked by the jail eleven months prior, in 2014. He was classified as "Special Conditions—Medical" on his intake form during that booking. The prior form asked "Do you currently need medical attention? If yes, why?" The booking officer responded "Yes. BECAUSE OF A CALCIUM DEFICIENCY." However, when booked days before Stufflebean died, Nauman answered "No" to the question on whether Stufflebean was a medical risk during prior contact or confinement with the department.

If Nauman had access to the prior form, his duty to correctly answer whether Stufflebean was a medical risk during his prior contact with the department was ministerial. He would have to view the prior form, see Stufflebean was reported as "Special Condition—Medical," and answer "Yes" to the question "Was inmate a medical, mental health or suicide risk during any prior contact with the department[.]" Answering that particular question was clerical, not requiring him to exercise his own judgment. *See* **Helms**, 624 S.W.3d at 163; **Alsup**, 588 S.W.3d at 191. It additionally did not require any explanation on Stufflebean's past intake. *See* **Letterman**, 859 F.3d at 1126 (prison's "close observation policy" was ministerial, as the "duty to report a medical emergency" when officers could not observe an inmate's movement or obtain a verbal response, or it appeared the inmate was not breathing, was "mandatory and [did] not depend on the officer's assessment

-39-

of whether a medical emergency actually exists." (alteration added) (applying Missouri law)); ***Jungerman v. City of Raytown***, 925 S.W.2d 202, 206 (Mo. banc 1996) (a booking officer's "inventorying, recording and storing" an inmate's property is ministerial), *abrogated on other grounds by **Southers***, 263 S.W.3d 603. *See also **Jungerman***, 925 S.W.2d at 206 ("The fact that written procedures cannot anticipate every circumstance does not transform a ministerial activity into a discretionary function.").

Nauman argues his duty to accurately report Stufflebean's prior status as a medical risk was not ministerial because he did not have access to Stufflebean's 2014 intake form. He asserts that without it, he could not answer the question in a routine or mundane way. *See **Alsup***, 588 S.W.3d at 191. From his deposition testimony, it is unclear whether he had access to Stufflebean's prior intake form. He gave inconclusive testimony on the question, stating:

> Q.    Was this December 23, 2014, medical intake screening form available to you when you were booking Mr. Stufflebean in October of 2015?
>
> **A.    No.**
>
> Q.    Where would you have been able to access it, or could you have accessed it if you wanted to?
>
> **A.    I'm not sure.**

Nauman's inconclusive testimony on accessing Stufflebean's prior records precludes summary judgment on this issue. *See **Wealot v. Brooks***, 865 F.3d 1119, 1128 (8th Cir. 2017) (on summary judgment, "Disputed factual issues and conflicting testimony should not be resolved by the district court." (citations omitted)); ***Hutson v. Walker***, 688 F.3d 477, 486 (8th Cir. 2012) (on summary judgment, official immunity is appropriate "if no genuine issue of material fact remains as to whether the ministerial obligations . . . were completed" (alteration

added)). If, as discussed, he had access to the form, his duty to answer the particular question is ministerial.[5]

\* \* \* \* \* \* \*

The judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

_____

_____

[5]In an affidavit filed months after his deposition, Nauman declared: "While booking Justin Stufflebean into the jail on October 26, 2015, I did not have access to the medical information from his prior detention in 2014." This declaration, being "inconsistent" with his deposition testimony that he was "not sure" about his ability to access the prior form, and giving no explanation for that inconsistency, does not resolve the genuine issue of material fact. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983) ("If testimony under oath, however, can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment."). *See McLean*, 548 F.3d at 616 (on summary judgment, considering the evidence most favorably to the nonmoving party, including all reasonable inferences).